**Roy H. LOMAS, Sr., d/b/a Roy Lomas Carpet Contractor, Appellee**

v.

**James B. KRAVITZ, Cherrydale Construction Co., Andorra Springs Development, Inc., and Kravmar, Inc., f/k/a Eastern Development Enterprises Inc., Appellants**

**No. 87 MAP 2016**

Supreme Court of Pennsylvania.

ARGUED: March 8, 2017
DECIDED: September 28, 2017

Rigel Caitlin Farr, Esq., Mathieu Jode Shapiro, Esq., Obermayer Rebmann Maxwell & Hippel LLP, Thomas A. Leonard, Esq., for Appellants.

Andrew J. DeFalco, Esq., Paul R. Rosen, Esq., Spector Gadon & Rosen, P.C., Monica Mathews Reynolds, Esq., Connor, Weber & Oberlies, for Appellee.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

## OPINION

JUSTICE BAER

In this appeal, the Court is asked to determine whether a trial court erred by denying a motion to recuse the entire bench of the Court of Common Pleas of Montgomery County. Specifically, we consider whether the moving parties waived their recusal claim and, if not, whether the claim has merit. For the reasons set forth below, we hold that the recusal issue was untimely presented to the trial court and, thus, waived. Accordingly, we affirm the judgment of the Superior Court.

The relevant background underlying this matter, which now spans more than 25 years, can be summarized as follows. Appellant James B. Kravitz ("Kravitz") was the sole officer, director, and shareholder of several companies known as the Andorra Group, which included Appellants Cherrydale Construction Company ("Cherrydale"), Andorra Springs Development, Incorporated ("Andorra Springs"), and Kravmar, Incorporated, which was formally known as Eastern Development

Enterprises, Incorporated ("Eastern").[1] Kravitz also owned a piece of property known as the Reserve at Lafayette Hill ("Reserve"). Andorra Springs was formed to develop residential housing on sections of the Reserve. In 1993, Andorra Springs hired Cherrydale as the general contractor to build the homes on the Reserve. Eastern operated as the management and payroll company for the Andorra Group.

Appellee Roy H. Lomas, Sr., d/b/a Roy Lomas Carpet Contractor ("Lomas") is the proprietor of a floor covering company. On November 10, 1994, Cherrydale and Lomas entered into a contract which required Lomas to supply and install floor covering in the homes being built by Cherrydale. Soon thereafter, Cherrydale breached that contract by failing to pay $30,913 to Lomas. In January of 1995, Lomas demanded that Cherrydale submit Lomas' claim to binding arbitration as mandated by the parties' contract.

The parties arbitrated the matter, and a panel of arbitrators entered an interim partial award in favor of Lomas, finding that Cherrydale breached the parties' contract and violated the Contractor and Subcontractor Payment Act, 73 P.S. §§ 501–516. Following Kravitz's unsuccessful attempt to have the interim award vacated, the arbitrators issued a final award to Lomas in the amount of $200,601.61, which included the $30,913 that Cherrydale owed to Lomas for his unpaid work, as well as costs and fees. On September 10, 1998, judgment was entered against Cherrydale in the Court of Common Pleas of Montgomery County. Important to the issue before this Court, then-Attorney, now-Judge Thomas C. Branca, Esquire, represented Lomas throughout the arbitration proceedings.

Since the entry of judgment in 1998, Kravitz has actively prevented Lomas from collecting his arbitration award by, *inter alia*, transferring all of the assets out of Cherrydale to himself and other entities under his control and, as the Superior Court put it, through "his campaign of incessant use and abuse of our civil litigation processes."[2] *Lomas v. Kravitz*, 130 A.3d 107, 112 (Pa. Super. 2015). In March of 2000, Lomas commenced the instant action against Appellants. Then-Attorney Branca filed the complaint on behalf of Lomas. Lomas sought to pierce the corporate veil and to hold Kravitz personally liable for the debt Cherrydale owed to Lomas. Lomas also presented claims of fraud and fraudulent transfers under the Pennsylvania Uniform Fraudulent Transfers Act, 12 Pa.C.S. §§ 5101–5110. In terms of relief, Lomas asked that judgment be entered against Appellants in the amount of $200,601.61. He also requested interest, costs, punitive damages, and attorneys' fees.

In November of 2001, then-Attorney Branca was elected to serve as a judge on the Court of Common Pleas of Montgomery County. Prior to taking the bench, then-Judge-Elect Branca withdrew his appearance in the matter and referred the case to Lomas' current counsel from the law firm of Spector, Gadon, & Rosen ("SGR"). After several years of tedious litigation, the parties agreed to a bifurcated bench trial. The presiding judge was the Honorable Thomas P. Rogers of the Court of Common Pleas of Montgomery County. Based upon the parties' agree-

---

1. We will refer to Kravitz, Cherrydale, Andorra Springs, and Eastern collectively as "Appellants."

2. The details of Kravitz's numerous actions which have thwarted Lomas from collecting his arbitration award are irrelevant to the disposition of the issues before the Court; thus, we will not delve into all of those details.

ment, Judge Rogers first was tasked with determining whether Appellants were liable to Lomas. The second phase of trial, if necessary, would require Judge Rogers to examine whether Appellants should be required to pay attorneys' fees and punitive damages to Lomas.

Appellants concede that, before trial began, the parties met with Judge Rogers to discuss whether it was appropriate for him to preside over the trial in light of now-Judge Branca's previous representation of Lomas. Appellants' Brief at 10. Appellants also concede that the parties agreed to allow Judge Rogers to decide the matter; however, as we discuss *infra*, Appellants maintain that, during these pre-trial proceedings, they were unaware of Judge Branca's continued financial interest in the outcome of the case and his continuing discussions with counsel from SGR regarding at least certain aspects of this case after he took the bench. *Id.* at 10–11.

The three-day liability trial was held from January 16, 2007, through January 18, 2007. After that trial, the parties submitted proposed findings of fact and conclusions of law. In July of 2007, Judge Rogers entered an order declaring that Appellants are liable to Lomas. Accordingly, a bench trial on attorneys' fees and punitive damages was scheduled to begin in September of 2007. The first day of the trial on attorneys' fees and punitive damages occurred on September 4, 2007. The second and last day of the trial was September 6, 2007. Judge Branca was Lomas' first witness to testify on September 6th.

The direct examination of Judge Branca was relatively brief and focused on the attorneys' fees for which Judge Branca billed Lomas when he represented Lomas in this matter. N.T., 9/6/2007, at 3–14. Toward the end of the direct examination, counsel for Lomas asked Judge Branca whether he has had any communications with Lomas' current counsel, the law firm of SGR. N.T., 9/6/2007, at 13. Judge Branca answered the question in the affirmative and explained that the communications ordinarily involved the location of things like documents. *Id.* at 13–14. According to Judge Branca, the communications between him and SGR were informative to him, "not the other way around." *Id.* at 14. Judge Branca testified that, because he referred the case to the firm, SGR periodically updated him on the status of the case. The judge further testified that he had not had any communications with Judge Rogers concerning the case. *Id.*

Appellants' cross examination of the judge was more extensive. *Id.* at 15–49. Appellants' counsel comprehensively questioned Judge Branca regarding the communications that he had with SGR after the judge withdrew his appearance and took the bench. In addition, when counsel asked Judge Branca why SGR provided him with updates, the judge testified as follows:

> Because I had an interest in the case, I have a financial interest in the case. I have—I'm entitled to a referral fee. And so to the extent that I'm entitled to a referral fee, I'm entitled to know something about what's happening with the case, not only for my information but for purposes of my disclosing whatever I might need to disclose if and when I get a fee.

*Id.* at 22. In terms of the amount of a fee to which he is entitled, Judge Branca explained that he "should get a third referral fee of the net proceeds as a fee." *Id.* Judge Branca maintained that he had not discussed the case with anyone other than Lomas and SGR. *Id.* at 23.

After several more questions and answers, counsel for Lomas objected, contending that the line of questioning was irrelevant given that the sole issue to

which Judge Branca could testify was the amount of attorneys' fees that he billed Lomas. *Id.* at 25. A lengthy discussion then took place, during which counsel for Lomas suggested that Appellants' line of questioning was "a red herring" and that Appellants simply were attempting to impugn the reputations of SGR, Judge Branca, and the trial court. *Id.* at 27. Lomas' counsel also suggested that Appellants were attempting to divert attention away from the fact that Kravitz had fraudulently transferred millions of dollars to defraud his creditors. *Id.*

In due course, Lomas' objection was overruled, and Appellants' counsel continued to question Judge Branca about his involvement with this case after he took the bench. After Appellants completed their cross examination of Judge Branca, Lomas called two more witnesses, Kravitz and Raymond F. Dovell, a certified public accountant hired by Lomas to provide a forensic review of Kravitz and his entities.

After Lomas rested regarding attorneys' fees and punitive damages, Appellants first presented the testimony of Monica Mathews Reynolds ("Reynolds"), an associate attorney for SGR, Lomas' counsel, as if on cross. Appellants questioned her about, *inter alia,* Judge Branca's involvement in the case. When Lomas' counsel again objected, Judge Rogers asked Appellants' counsel to explain the relevance of the line of questioning. *Id.* at 104. Appellants' counsel stated, "Judge, I think if Judge Branca had any involvement in this case as to any participation in this case, I have some suspicion or am suspect in some way that this case can go forward. I may have to raise that. That's why I'm asking." *Id.* Judge Rogers allowed counsel to continue to question Reynolds. Thereafter, Appellants called Kravitz to testify in his own defense.

After the parties presented all of their evidence, Appellants' counsel requested that the record remain open to allow Appellants to have a forensic accountant examine invoices Lomas recently provided to Appellants in support of his claim for attorneys' fees. *Id.* at 120. Appellants' counsel assured Judge Rogers that Appellants would immediately notify the judge if they decided not to have a forensic accountant review the invoices or if such a review proved to be fruitless. *Id.* at 122. Over Lomas' objection, Judge Rogers granted Appellants' request, permitting them 30 days to have a forensic accountant examine the pertinent records. *Id.* at 123. Thirty days passed, and Appellants did not file anything. Further, contrary to their counsel's assurances, Appellants did not notify Judge Rogers of whether they decided not to have a forensic accountant review the invoices.

A scheduling conference took place on October 15, 2007, *i.e.,* 39 days after the last day of trial and nine days after the 30–day period expired for Appellants to explore obtaining a forensic accountant. Appellants appeared at the hearing with new counsel and presented Judge Rogers with a "Motion for Recusal, Transfer of Venue, or Assignment to Out-of-County Judge" ("Recusal Motion"). According to Appellants' Recusal Motion, on August 31, 2007, *i.e.,* just prior to the commencement of trial on attorneys' fees and punitive damages, Lomas produced for the first time redacted and unredacted billing entries for SGR. Recusal Motion at ¶ 8. On September 4, 2007, Appellants received unredacted copies of the billing entries, which indicated that attorneys from SGR had consulted with Judge Branca approximately 20 times since 2002.[3] *Id.* at ¶ 9. Appellants noted that, during his trial testimony, Judge Branca confirmed his continued involve-

---

**3.** Judge Branca was sworn-in during early January of 2002.

ment in the case and that he has a financial interest in the outcome of the matter. *Id.* at ¶ 10.

Although Appellants acknowledged that they were unaware of any bias or prejudice against them on the part of Judge Rogers or any other judge of the Court of Common Pleas of Montgomery County, Appellants maintained that Judge Branca's continued involvement and financial interest in the case created an "appearance of impropriety" prohibited by the Code of Judicial Conduct. *Id.* at ¶¶ 11–12. Appellants, therefore, requested that Judge Rogers enter an order recusing the entire bench of Montgomery County and either assigning the case to an out-of-county judge for purposes of a new trial on both liability and damages or transferring the case to another county for the same purposes, which effectively would render void all of the proceedings before Judge Rogers.

On October 18, 2007, Judge Rogers entered an order granting the Recusal Motion. However, in a motion filed on October 22, 2007, Lomas argued that the court should stay the October 18ᵗʰ order and allow him to respond to the Recusal Motion. According to Lomas' motion, Judge Rogers had informed the parties that Lomas would have until October 24, 2007, to respond the Recusal Motion; yet, the judge granted the Recusal Motion on October 18ᵗʰ, before Lomas could file his response. Motion for a Stay of the October 18, 2007 Order, 10/22/2007, at ¶¶ 1–4. Lomas then filed his response to the Recusal Motion on October 24, 2007, and Judge Rogers held a hearing regarding the issue on November 9, 2007.

Judge Rogers did not act on the recusal issue again until December 31, 2008, at which time he entered an order vacating the October 18, 2007, order. On the same day, Judge Rogers issued a separate order denying the Recusal Motion and entering partial judgment as to the liability phase of trial. The court awarded Lomas $200,601.61 in compensatory damages, plus statutory interest.

Judge Rogers authored a memorandum in support of his orders.[4] In that memorandum, the judge observed that Appellants sought an order assigning the case to an out-of-county judge or transferring the case to another county for trial on both liability and damages, despite the fact that, in his view, the case already had been fairly tried on its merits. Trial Court Memorandum, 12/31/2008, at 11. The judge highlighted that, when Appellants presented their Recusal Motion, the bifurcated trial was complete as to liability and all damage claims, and the court had already ruled on liability, which necessarily left intact the arbitrators' award of $200,601.61. Thus, the only remaining matter to be determined was whether Lomas was entitled to attorneys' fees and punitive damages. *Id.*

Judge Rogers rejected Appellants' claim that the issues surrounding Judge Branca created an "appearance of impropriety," reasoning that the claim failed to provide the court with a legal basis upon which it could conclude that Appellants "cannot receive, have not received or will not continue to receive a fair and impartial trial in Montgomery County." *Id.* Judge Rogers pointed out that Judge Branca is not a party to the case, and he opined that "[n]o appearance of impropriety exists or is presumed to exist simply because a Judge of the Court of Common Pleas of Montgom-

4. While we will briefly summarize this memorandum, given this Court's ultimate determination that Appellants waived the recusal issue, we will not provide a detailed analysis of the legal reasoning employed by Judge Rogers in denying the Recusal Motion.

ery County has an interest in the underlying case." *Id.* at 13. Judge Rogers ended his memorandum by explaining that the record does not demonstrate prejudice or bias against Appellants; thus, the judge refused to allow Appellants to question the court's verdict.[5] *Id.*

Appellants attempted to appeal the matter at that point; however, the Superior Court quashed the appeal. Appellants then petitioned this Court, asking for a stay of the trial court proceedings and for the Court to exercise its King's Bench power to assume jurisdiction over the matter. Appellants also filed their motion for a stay in the Superior Court. The Superior Court denied the motion for a stay, and this Court denied the motion for a stay and the request that the Court exercise its King's Bench authority.

On April 29, 2011, Judge Rogers issued separate findings of fact and conclusions of law pertaining to the trial on liability and compensatory damages and the separate (bifurcated) trial on attorneys' fees and punitive damages. The court awarded Lomas a total of $1,688,379.10, which included nearly $602,000 in punitive damages. Appellants filed post-trial motions, which the trial court denied. On August 16, 2011, judgment was entered in favor of Lomas and against Appellants.

Appellants appealed to the Superior Court, raising a number of issues regarding the liability verdict and the assessment of attorneys' fees and punitive damages. The court eventually heard the matter *en banc*.[6] The court unanimously affirmed the liability verdict. However, the court evenly split regarding the propriety of the trial court's assessment of attorneys' fees and punitive damages.[7] The split centered on whether Judge Rogers erred by denying Appellants' Recusal Motion.

The opinion in support of affirming the trial court's judgment ("OISA") determined that Appellants waived the recusal issue by untimely presenting it to Judge Rogers. In reaching this determination, the OISA quoted and relied upon this Court's decisions in *In re Lokuta*, 608 Pa. 223, 11 A.3d 427, 437 (2011), and *Goodheart v. Casey*, 523 Pa. 188, 565 A.2d 757, 763 (1989), for the proposition that a "party seeking recusal or disqualification [is required] to raise the objection at the *earliest possible moment*, or that party will suffer the consequence of being time barred." [8] *Lomas*, 130 A.3d at 120 (emphasis in original).

The OISA opined that Appellants had two opportunities to seek recusal prior to when they filed their Recusal Motion. The

---

**5.** In his opinion filed pursuant to Pa.R.A.P. 1925(a), Judge Rogers noted his belief that Appellants waived the recusal issue by untimely raising it. *See* Trial Court Opinion, 1/15/2013, at 22 n.4 ("Moreover, in light of the fact that Counsel failed to object to the undersigned's continued involvement on September 6, 2007, and waited until October 15, 2007, to present their motion, the [c]ourt opines that the issue is waived for all intents and purposes.").

**6.** Due to Judge Allen's non-participation in the consideration of the appeal, the *en banc* panel consisted of eight judges.

**7.** Because the court was equally divided in this manner, it necessarily affirmed the trial

court's judgment. *See Creamer v. Twelve Common Pleas Judges*, 443 Pa. 484, 281 A.2d 57, 58 (1971) (explaining that "when an appellate court is equally divided, the judgment, order or decree of the court below will be affirmed").

**8.** Later in its opinion, the OISA also supported this proposition by referring to the Superior Court's opinion in *Reilly by Reilly v. SEPTA*, 330 Pa.Super. 420, 479 A.2d 973 (1984), and this Court's subsequent opinion in that matter, *Reilly by Reilly v. SEPTA*, 507 Pa. 204, 489 A.2d 1291 (1985). *Lomas*, 130 A.3d at 121–22.

OISA stated that Appellants first could have presented their Recusal Motion before the liability trial in January of 2007 when Judge Rogers assured the parties that he could remain fair and impartial despite Judge Branca's previous representation of Lomas. According to the OISA, the second opportunity to present the recusal claim came on September 6, 2007, immediately after Judge Branca's testimony regarding his involvement and personal interest in the case. *Id.* Instead of seeking recusal of the entire bench of Montgomery County immediately after Judge Branca's testimony (or earlier), the OISA observed, Appellants allowed the damages trial to proceed to finality and "it was not until Appellants requested a post-hearing thirty-day review of the attorneys' bills, and the thirty-day period had passed without Appellants filing any relevant documents, and not until the record had closed, that newly-retained counsel appeared and filed the recusal motion." *Id.* at 121. The OISA concluded that Appellants untimely presented the Recusal Motion and, thus, waived their recusal issue.[9]

The opinion in support of reversing the trial court's judgment ("OISR") believed that Judge Rogers erred by denying the Recusal Motion. The OISR began by providing a history of the "appearance of impropriety" standard for judicial recusal and then explaining parties' substantive right to request the recusal of a jurist. *Id.* at 133–38. The OISR also discussed the application of the "appearance of impropriety" standard to this matter and ultimately concluded that this standard required Judge Rogers to grant, in part, Appellants' Recusal Motion. According to the OISR, Judge Branca's financial interest in the case created an "appearance of

improriety," which necessitated that Appellants receive a new trial, in front of an out-of-county judge, on attorneys' fees and punitive damages.

In addition, the OISR disagreed with the OISA's conclusion that Appellants waived their recusal issue by untimely presenting it to Judge Rogers. *Id.* at 145–47. The OISR took the position that Appellants could not have raised the issue any earlier than September 6, 2007, when Judge Branca testified regarding his financial interest in the outcome of the case. *Id.* at 145. Regarding the law in this area, the OISR agreed with the general proposition that a party must seek recusal at the earliest possible moment to avoid waiving the issue; however, the OISR distinguished this case from those relied upon by the Majority for this general proposition. *Id.* at 145–47.

In this regard, the OISR opined that, in *In re Lokuta, Goodheart,* and *Reilly,* the recusal motions were untimely filed because the moving parties presented their motions after an adverse verdict had been entered against them. Here, however, according to the OISR, Appellants filed their Recusal Motion before Judge Rogers entered a verdict. Thus, in the OISR's view, these cases do not support a conclusion that Appellants waived their recusal issue by untimely presenting it. *Id.*

In closing on this discussion, the OISR inaccurately stated that Appellants filed their Recusal Motion during the 30–day post-trial period in which Judge Rogers permitted the record to remain open to allow Appellants to determine whether they needed the services of a forensic account. *Id.* at 146. The OISR suggested that a decision to seek the recusal of an entire

---

9. The OISA offered a gratuitous alternative conclusion that the recusal issue lacks merit.

*Lomas,* 130 A.3d at 122–25.

county bench requires counseled judgment and is distinct from common evidentiary objections that require immediate action to allow the trial court to correct an alleged error. *Id.* at 146–47. For these reasons, the OISR would have mandated that Appellants receive a new trial on attorneys' fees and punitive damages, to be presided over by an out-of-county judge.

Appellants filed a petition for allowance of appeal, which this Court granted, limited to the following issues:

(1) Whether, as a matter of law, the Montgomery County Court of Common Pleas should have been recused from presiding over the non-jury trial due to an appearance of impropriety arising from the ongoing participation and financial interest in the litigation by a sitting member of that Court?

(2) Whether, as a matter of law, an appearance of impropriety was created when a sitting member of the Montgomery County Bench personally participated in the litigation?

*Lomas v. Kravitz*, 637 Pa. 207, 147 A.3d 517 (2016).

 In their brief to this Court, Appellants devote a majority of their argument to the merits of the recusal issue, *i.e.,* whether Judge Branca's financial interest and continued involvement in this case constituted an "appearance of impropriety" such that the entire bench of Montgomery County should have been recused from considering the matter. Appellants' Brief at 23–38. Regarding the timing of their Recusal Motion, Appellants contend that they first learned of the full extent of Judge Branca's continued involvement in this matter on September 6, 2007; therefore, Appellants argue, they could not have presented their Recusal Motion prior to that date.[10] Appellants' Brief at 39–41.

Appellants also adopt the OISR's theory that this case is distinguishable from *In re Lokuta, Goodheart,* and *Reilly,* where the moving parties allegedly waited to seek recusal until after the adverse outcomes of their litigation were determined. *Id.* at 42–43. Appellants highlight that they filed their Recusal Motion years before Judge Rogers entered a final verdict in this matter. In Appellants' view, they quickly moved for recusal after Judge Branca's revealing testimony; thus, Appellants take the position that they did not waive the recusal issue. *Id.*

Lomas takes the position that, in cases involving an alleged "appearance of impro-

---

10. Lomas maintains that Appellants failed to present any discrete issue regarding waiver in their petition for allowance of appeal ("PAA"). Lomas' Brief at 18–19. Lomas suggests that, due to this oversight, Appellants essentially have waived review by this Court of the OISA's determination that they untimely presented and, therefore, waived the recusal issue. In short, Lomas insists that this Court cannot address waiver because that issue is outside of the scope of the order granting allowance of appeal. *Id.* at 18–21.

We agree with Lomas that none of the questions Appellants presented in their PAA directly implicate the issue of whether Appellants timely presented the recusal issue. PAA at 5–6. However, Appellants provided a thorough argument regarding the timing of their Recusal Motion in their PAA, which we grant-ed as to the merits issues set forth above. *Id.* at 27–31. Moreover, the OISA found the recusal request to be untimely and waived. Thus, in order for this Court to address the questions for which allocatur was granted, we must consider the timeliness of the Recusal Motion as a threshold issue. We further observe that the parties have briefed for this Court their positions concerning the timing of the motion and whether the alleged late filing resulted in waiver. Finally, because we ultimately conclude that the lower court correctly resolved the issue and because "this Court has the ability to affirm a valid judgment or order for any reason appearing as of record," *Commonwealth v. Flanagan,* 578 Pa. 587, 854 A.2d 489, 503 (2004) (footnote omitted), we can address this question.

priety," waiver is particularly applicable when all of the underlying facts regarding the allegation of impropriety have been made public. Lomas' Brief at 19. According to Lomas, when a litigant is aware of all of these facts but fails to object timely, a finding of waiver is appropriate. *Id.* (citing *Goodheart, supra*). Lomas points out that, here, all of the facts underlying Appellants' recusal issue were known to Appellants as of when Judge Branca testified. Yet, Appellants waited 39 days to present their Recusal Motion. For these reasons, Lomas insists that Appellants untimely presented their Recusal Motion and, thus, waived the recusal issue.

 This Court reviews the denial of a motion to recuse for an abuse of discretion. *See In re Lokuta*, 11 A.3d at 435 (explaining that an "appellate court presumes judges are fair and competent, and reviews the denial of a recusal motion for an abuse of discretion"). "An abuse of discretion is not merely an error of judgment, but occurs only where the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record." *Zappala v. Brandolini Prop. Mgmt., Inc.*, 589 Pa. 516, 909 A.2d 1272, 1284 (2006).

From this Court's perspective, the law in this area is well settled: "The case law in this Commonwealth is clear and of long standing; it requires a party seeking recusal or disqualification to raise the objection at the earliest possible moment, or that party will suffer the consequence of being time barred." *Goodheart*, 565 A.2d at 763 (citing *Reilly by Reilly v. SEPTA*, 507 Pa. 204, 489 A.2d 1291 (1985)). Despite this clear pronouncement of the law, Appellants contend that this legal proposition applies only if a litigant seeks to recuse a jurist after a final adverse verdict, despite the litigant possessing all of the necessary facts to seek recusal pre-verdict. *See* Appellants' Brief at 42–43 ("The Motion for Recusal was unquestionably not a 'hedge against a losing case' [ ] and the timing of this case is clearly distinguishable from the cases on which the *en banc* Majority relies, where litigants waited to move for recusal until after knowing the outcome.") (citing *In re Lokuta, Goodheart*, and *Reilly, supra*). Appellants' contention is not supported by the general statement of the law, as provided above, or by the relevant case law.

By way of example, in *Reilly*, counsel for Southeastern Pennsylvania Transportation Authority ("SEPTA") made an oral pretrial request that the trial judge recuse himself from the case. *Reilly*, 489 A.2d at 1296. Counsel alleged that the judge held a personal bias against him based upon remarks the judge made about counsel in a previous case. The trial judge invited counsel to file a written motion for recusal within five days of his oral request. *Id.* Counsel, however, filed his recusal motion eight months later, which fell on the eve of trial. *Id.* at 1296–97. The judge denied the motion. *Id.* at 1297.

SEPTA renewed its recusal motion post-trial. SEPTA based its post-trial motion to recuse on the trial judge's alleged prior hostility toward its counsel and on the additional ground that opposing counsel previously represented the trial judge as part of a class of plaintiffs who sought increased compensation for Pennsylvania trial court judges. An *en banc* panel of the trial court denied the motion as meritless. On appeal, SEPTA renewed their recusal issue in the Superior Court and added additional grounds in support thereof—grounds that SEPTA raised for the time on appeal. *Id.*

This Court eventually considered the matter. Importantly, the Court expressly

stated, "In the case *sub judice*, SEPTA's recusal motions being raised in both pre and post-trial fashion require us to decide their timeliness." *Id.* at 1300. The Court first concluded that SEPTA waived its pre-trial recusal issue. We observed that SEPTA offered no excuse for its eight-month delay in presenting the issue. We further observed that SEPTA, in fact, could not excuse its delay because SEPTA had actual knowledge of the facts that formed the basis of its motion to recuse.[11] *Id.*

The Court then examined the timeliness of SEPTA's post-trial recusal motions. As to these motions, the Court began by stating, "Once the trial is completed with the entry of a verdict, a party is deemed to have waived his right to have a judge disqualified, and if he has waived that issue, he cannot be heard to complain following an unfavorable result." *Id.* (citing *Commonwealth v. Corbin*, 447 Pa. 463, 291 A.2d 307 (1972)). The Court explained that, to preserve these recusal issues for appeal, SEPTA was required to make timely, specific objections at trial and raise the issues in a post-trial motion. *Id.* In other words, recusal issues that are not presented at the earliest possible moment but, instead, are raised for the first time post-trial, are time-barred and waived.

■ Thus, the law is clear. In this Commonwealth, a party must seek recusal of a

jurist at the earliest possible moment, *i.e.*, when the party knows of the facts that form the basis for a motion to recuse. If the party fails to present a motion to recuse at that time, then the party's recusal issue is time-barred and waived. *See Reilly, supra; see also Goodheart*, 565 A.2d at 763 ("Where the asserted impediment [to a jurist deciding a case] is known to the party, and that party fails to promptly direct the attention of the jurist to that fact, the objection is waived and the party may not subsequently offer the objection as a basis for invalidating the judgment."); *id.* at 764 ("In the case, *sub judice*, the facts suggesting the disqualification [of Justices of this Court] were known or should have been known when the case was called for argument and are therefore waived. This is so because the jurist, under such circumstances, may properly assume that the lack of objection by the litigants reflects the appropriateness of his or her participation."); *In re Lokuta*, 11 A.3d at 437 ("Appellant did not mention Judge Sprague's age in her pre-trial recusal motions, nor did she move to disqualify Judges Musmanno or Bucci before or during trial. She provides no reason for not raising either of these issues sooner. Because appellant failed to raise these issues at the earliest possible opportunity, they are waived.").[12]

---

11. After the Court found that SEPTA had waived its pre-trial recusal issue, the Court found that the trial judge's assurances of impartiality were sufficient to justify his dismissal of the motion. *Reilly*, 489 A.2d at 1300.

12. We reject the position of the OISR, which Appellants adopted in this appeal, that a litigant waives a recusal issue only if he raises it following an adverse verdict. Instead, when a litigant is aware of the facts underlying a recusal issue pre-verdict but waits to present the issue until after an adverse verdict, pursuant to the reasoning underlying *Reilly, supra*, the litigant waives the issue on two grounds:

the failure to present the issue at the earliest possible moment, and the failure to preserve the issue at trial by lodging a timely, specific objection regarding recusal.

We nonetheless believe it is worth noting that, when Appellants filed their Recusal Motion, Judge Rogers already had entered an adverse verdict against them regarding liability, which necessarily involved a negative decision concerning compensatory damages. Moreover, when Appellants presented their Recusal Motion, for all intents and purposes, the die was cast as to Lomas' eligibility to receive attorneys' fees and punitive damages. Thus, the

As to the matter currently before the Court, we agree with Appellants that they did not know of all of the facts underlying their recusal issue until Judge Branca testified on September 6, 2007. However, Appellants clearly were aware of all of the facts underlying the recusal issue on that date. Indeed, all of the facts Appellants averred in their Recusal Motion, in support of their belief that recusal was appropriate, were disclosed on or before September 6, 2007, during the judge's testimony.

Moreover, as we mentioned above, during Reynolds' September 6, 2007, trial testimony, Judge Rogers asked Appellants' counsel to explain why he was questioning Reynolds about Judge Branca's involvement in this case. N.T., 9/6/2007, at 104. Appellants' counsel responded, "Judge, I think if Judge Branca had any involvement in this case as to any participation in this case, I have some suspicion or am suspect in some way that this case can go forward. I may have to raise that. That's why I'm asking." *Id.* Thus, despite Appellants' knowledge of all of the facts underlying their eventual recusal issue after Judge Branca testified on September 6th and their September 6th announcement that they may need to raise an issue regarding Judge Branca's participation in this matter, without even seeking recusal, Appellants allowed: additional witnesses to testify at the trial on damages; the evidentiary portion of that trial to conclude;

the 30–day time period, which they requested to allow for forensic review of records, to expire; and an additional nine days to pass following the expiration of that 30–day time period. It was not until after all of these events that Appellants finally filed a Recusal Motion on October 15, 2007.

We need not decide the exact moment in which Appellants were required to present the recusal issue to avoid waiver. However, it is obvious that October 15, 2007, was not "the earliest possible moment" that Appellants could have raised their objections regarding recusal, as all of the facts underlying the recusal issue were known to Appellants after Judge Branca testified on September 6, 2007. Accordingly, we hold that Appellants failed to file the Recusal Motion in a timely manner and, therefore, waived the issue.[13, 14] We, thus, affirm the judgment of the Superior Court.

Justices Todd, Dougherty and Mundy join the opinion.

Chief Justice Saylor files a dissenting opinion.

Justices Donohue and Wecht did not participate in the consideration or decision of this case.

## DISSENTING OPINION

### CHIEF JUSTICE SAYLOR

Although I agree with the majority that a motion for recusal must be promptly

OISR's attempt at distinguishing the relevant cases from this matter appears to be invalid.

**13.** This conclusion obviates the need for the Court to examine whether the recusal issue has merit, as any such discussion would be pure *dicta*.

**14.** In his Dissenting Opinion, Chief Justice Saylor states that he would adopt a four-factor test, utilized by some federal courts, to assess whether a party timely sought recusal.

The Dissent then retroactively applies that test to the facts of this case, concluding that Appellants timely filed their Recusal Motion. Respectfully, we are circumspect to adopt and apply a new test in this case, particularly when the parties offer no advocacy in this regard. In our view, this matter requires the Court to determine whether Appellants waived their recusal claim pursuant to current Pennsylvania precedent, and we answer that question in the affirmative.

filed, my view diverges from the majority's application of the "earliest possible moment" standard and its conclusion that Appellants' filing was untimely. Majority Opinion, at 389. I believe that, in the circumstances presented, Appellants' submission was not late, and further, they demonstrated an appearance of impropriety, warranting the recusal of the full Montgomery County bench.

Beginning with the "earliest possible moment" precept, the language of this standard, if taken literally, suggests that an immediate response is required, akin to an evidentiary objection, which I believe is problematic in the recusal context. For example, the Superior Court's Opinion in Support of Affirmance ("OISA") in this matter indicated that Appellants were required to halt the proceedings and file a recusal motion immediately following Judge Branca's testimony that revealed his financial interest, rather than proceed with the other witnesses who were present and prepared to testify that day. *See Lomas v. Kravitz*, 130 A.3d 107, 120 (Pa. Super. 2015) (*en banc*) (OISA).[1] In this respect, the majority's reasoning does not elaborate what considerations or circumstances generally inform the timeliness analysis. Instead, it merely recites the number of elapsed days and observes that the parties' evidentiary presentations had concluded.

As the United States Supreme Court has cautioned, a request for recusal "should not be made lightly." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 826–27, 106 S.Ct. 1580, 1588, 89 L.Ed.2d 823 (1986) (citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923) (explaining that recusal motions should be

filed with "care and good faith")); *In re Crawford's Estate*, 307 Pa. 102, 109, 160 A. 585, 587 (1931) ("The charge of disqualification is serious, and should not be made lightly or frivolously."). "[A] request for the disqualification of a trial judge is a most serious undertaking which should not be pursued absent thorough factual investigation and legal research." *Johnson v. Dist. Court In & For Jefferson Cty.*, 674 P.2d 952, 957 (Colo. 1984).

Even though judges are presumed to be impartial arbiters and conscientious of potential biases and appearances of such, some practitioners express reservations that seeking recusal will be taken personally by the judge to the detriment of the client and counsel. *See* Debra Lyn Bassetta, Rex R. Perschbacher, *The Elusive Goal of Impartiality*, 97 Iowa L. Rev. 181, 204 (2011) (acknowledging attorneys' concerns that the suggestion of disqualification "has the potential to antagonize the challenged judge, either consciously or subconsciously, with the result that the moving litigants and their counsel may suffer" (quoting Richard E. Flamm, Judicial Disqualification: Recusal and Disqualification of Judges § 1.7, at 18 (2d ed. 2007))). Thus, the perceived potential for retribution may cause counsel to be reluctant to file a motion in the first instance. *See* Jeffrey Cole, *Jilting the Judge: How To Make and Survive a Motion To Disqualify*, 34 Litigation, no. 2, Winter 2008, at 48 ("Lawyers are as quick to see bias as they are reluctant to file disqualification motions."). Additional reluctance may stem from a lack of substantial information supporting the request, apart from speculation and hearsay. *See* Amanda Frost, *Keeping Up Appearances: A Process-oriented Ap-*

---

1. The Superior Court OISA also indicated that Appellants had an opportunity to seek recusal when they were informed of Judge Branca's prior representation. *See Lomas*, 130 A.3d at 120 (OISA). I agree with the majority, however, that Appellants were not aware of all the facts relevant to their recusal motion until Judge Branca testified on September 6, 2007. *See* Majority Opinion, at 391.

*proach to Judicial Recusal*, 53 U. KAN. L. REV. 531, 568–69 (2005) (observing that, in many instances, a party will only possess uncorroborated information and noting that there are rarely procedures for investigating speculation or gossip, thus resulting in a reluctance to advance a disqualification claim).

Further, there is arguably some procedural ambiguity in Pennsylvania's recusal jurisprudence that may result in requests not being sought with absolute immediacy. Relative to initiating a recusal request, the case law has variously referred to an "application by petition" or the filing of a "motion," *Reilly by Reilly v. SEPTA*, 507 Pa. 204, 220, 489 A.2d 1291, 1299 (1985), as well as the lodging of an "objection," *Goodheart v. Casey*, 523 Pa. 188, 199, 565 A.2d 757, 763 (1989); *see also Reilly*, 507 Pa. at 222, 489 A.2d at 1300 ("In order to preserve an issue for appeal, [the party has] to make a timely, specific objection at trial *and* raise the issue on post-trial motions." (emphasis in original)).[2]

Although this historical lack of consistency may be attributable to deviations in nomenclature, it is notable that there are no statutory or rules-based procedures for recusal in Pennsylvania, as there are in other jurisdictions.[3] *See, e.g.*, 28 U.S.C. § 144 ("Bias or prejudice of judge"), § 455 ("Disqualification of justice, judge, or magistrate judge"); ALASKA STAT. § 22.20.022 ("Peremptory disqualification of judge");

Alaska R.Crim.P. 25 ("Judge—Disqualification or Disability"); Colo.R.C.P. 97 ("Change of Judge"); Fla.R.Jud.Admin. 2.330 ("Disqualification of Trial Judges"); Ind. R. Trial P. 76 ("Change of venue"). The only written directive that arises in the recusal context comes by way of reference to Rule 2.11 of the Code of Judicial Conduct, which has been employed to inform the recusal standard. *See Goodheart*, 523 Pa. at 200, 565 A.2d at 763 (suggesting that a judge's self-evaluation of impartiality is guided by the factors provided in the Code of Judicial Conduct); Kenneth S. Kilimnik, *Recusal Standards for Judges in Pennsylvania: Cause for Concern*, 36 VILL. L. REV. 713, 726 (1991) ("Since 1974, the Code of Judicial Conduct had provided the sole non-case derived principles in Pennsylvania governing judicial recusal ...."). The lack of codified procedural direction has been cited as an impediment to requesting recusals. *See* Frost, *Keeping Up Appearances: A Process-oriented Approach to Judicial Recusal*, 53 U. KAN. L. REV. at 567 ("The very absence of statutorily prescribed procedures discourages lawyers from moving for disqualification and makes recusal motions all the more ad hoc and exceptional.").

In all, the above concerns reflect significant uncertainties on the part of practitioners that may reasonably delay the submission of recusal motions. Accordingly,

---

**2.** Tangentially, there is some criticism of the *Reilly* Court's recusal analysis (which later cases frequently referenced) insofar as it relied on *In re Crawford's Estate*, 307 Pa. 102, 160 A. 585 (1931). Specifically, *Reilly* adopted the recusal procedures from *Crawford's Estate* without acknowledging that the *Crawford's Estate* Court's explication pertained to the then-existing recusal statutes, which had been repealed prior to the *Reilly* decision. *See* Kenneth S. Kilimnik, *Recusal Standards for Judges in Pennsylvania: Cause for Concern*, 36 VILL. L. REV. 713, 725–27 (1991).

**3.** Although not applicable in civil matters, such as the present case, the Rules of Criminal Procedure require that requests for disqualification be included in an omnibus pretrial motion for relief. *See* Pa.R.Crim.P. 578, *Comment* (7). The Comment further advises that this rule is "not intended to limit other types of motions, oral or written, made pretrial or during trial," but it encourages the "earliest feasible submission" of such matters. *Id.; see also* Pa.R.J.C.P. 346, *Comment* (same).

given the importance of recusals in maintaining the legitimacy of the judiciary, *see* Emma J. Payne, Note, *Let the Sun Shine in: A Judicially Implied Timeliness Requirement Creates A Murky Standard for Federal Judges and Litigants and Perpetuates an Appearance of Bias in the Federal Judiciary*, 40 OKLA. CITY U. L. REV. 597, 606 (2015) (footnote omitted), and this atmosphere of uncertainty, I would not construe the "earliest possible moment" standard as implicating an objection-like immediacy mandate for raising a recusal issue on pain of waiver. Nonetheless, a timeliness requirement is a necessary component of the recusal framework in order to avoid unnecessary delays and judge-shopping, both of which impair the judicial process. *Scott v. Pryor (In re Chandler's Cove Inn, Ltd.)*, 74 B.R. 772, 773 (Bankr. E.D.N.Y. 1987) ("[R]ecusal motions which are too liberally granted are tantamount to unilateral 'judge shopping' and may be used for a delaying tactic, for their disposition requires a serious investment of judicial time and thought.").

Thus, I believe that questions of timeliness should be subject to a more discerning analysis, recognizing the above difficulties and providing some notice to litigants who may be faced with recusal scenarios. In the absence of delineated procedures, I would adopt the four-factor test employed by some federal courts in assessing whether a party seeking recusal does so at the "earliest possible moment":

whether (1) the movant has participated in a substantial manner in trial or pre-trial proceedings; (2) granting the motion would represent a waste of judicial resources; (3) the motion was made after the entry of judgment; and (4) the

movant can demonstrate good cause for delay.

*United States v. Amico*, 486 F.3d 764, 773 (2d Cir. 2007) (quoting *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 334 (2d Cir. 1987)). The demonstration of good cause for delay is "at the crux of the balancing" of these factors. *Id.* at 775 (quoting *United States v. Brinkworth*, 68 F.3d 633, 639 (2d Cir.1995)); *cf. Reilly*, 507 Pa. at 222, 489 A.2d at 1300 (explaining that moving party had failed to offer an excuse for its delay in filing the motion for recusal). The federal courts have also viewed this four-factor test as encompassing a good-faith requirement. *See Planned Parenthood of Se. Pa. v. Casey*, 812 F.Supp. 541, 546 (E.D. Pa. 1993) (citing *Smith v. Danyo*, 585 F.2d 83, 85 (3d Cir. 1978)).

Applying these factors here, it is evident that Appellants have substantially participated in the litigation, and that recusal of the trial judge at this late stage of the proceedings would represent a waste of judicial resources, thus militating toward the conclusion that the filing was late. However, these two factors must be tempered, at least in part, by acknowledging that the relevant facts undergirding the recusal motion arose at this late juncture in the litigation.[4] Furthermore, Appellants served Appellee with a request for production of documents seeking additional information relative to Judge Branca's involvement and financial interest on September 24, 2007, only 18 days following the pertinent hearing and prior to the closure of the record. Appellee refused the request and instead later opted to seek a protective order for the sought-after documentation.

---

4. In terms of applying the test to situations in which the facts implicating recusal are discovered near the end of proceedings, these two factors may be viewed as generally providing less overall guidance.

Regarding the timing of the filing relative to the entry of judgment, although there had been an adverse judgment against Appellants as to liability, the broader recusal concerns appear to have pertained to Judge Branca's financial interest that was contingent on the calculation of damages and discovered subsequent to the liability verdict.[5] Additionally, Appellants' filling of the recusal motion on October 15 coincided with a previously scheduled conference with the judge and parties to address briefing and final argument; thus, the motion was submitted in advance of any actual or anticipated intervening action by the court. In this regard, I respectfully differ with the majority's determination that the closure of the record, relative to the particulars of this case, is significantly material to the timeliness inquiry. See Majority Opinion, at 391. Accordingly, Appellants' request should be considered as having been forwarded prior to the entry of judgment.[6]

As to the final and most critical factor, good cause for delay, Appellants develop that they needed to carefully consider their claim for recusal and that they filed prior to any further advancement of the litigation, assertions which I believe provide reasonable explanations for the timing of their request. Furthermore, as previously noted, Appellants requested discovery pertaining to Judge Branca, and they also retained new counsel, both of which may be viewed as indicators that Appellants recognized the gravity of suggesting the recusal of not only the sitting trial judge, but all of his Montgomery County colleagues. Additionally, an earlier filing—for example, within the 30-day review period—would not have caused any less disruption or delay in the proceedings. See Riley v. State, 608 P.2d 27, 29–30 (Alaska 1980) (relaxing application of strict time limits on the basis that, inter alia, the later submission did not cause any additional delay than would have occurred if timely motioned). But see Wakefield v. Stevens, 249 Ga. 254, 290 S.E.2d 58, 61 (1982) (concluding that a 20-day delay was untimely). Accordingly, given the peculiar circumstances of this case and the lack of concrete procedural guidance, I find that good cause existed to justify Appellants' filing at the October 15 conference. Assessing the sum of these factors, with emphasis on Appellants' good cause for delay, I believe the motion for recusal should be deemed timely.

Since I would conclude that Appellants did not waive their challenge, I turn to the primary questions presented for review pertaining to whether the trial judge and/or the rest of the common pleas court should have recused in light of their colleague's participation and direct and proportional financial interest.[7]

---

5. The parties had previously agreed to proceed before Judge Rogers premised on Appellee's erroneous representation that Judge Branca's involvement in the matter had ended and all of his fees paid. See N.T., Nov. 9, 2007, at 48–49 (Appellee's counsel acknowledging that they had indicated that "all counsel fees had been paid" to Judge Branca).

6. Although the Superior Court OISA also observed that Appellants' filing followed James Kravitz's "appalling" testimony regarding his financial activity, Lomas, 130 A.3d at 125, it seems to me that most parties to a litigation will experience adverse circumstances at some point, particularly in lengthy and complex matters. Thus, although Kravitz's testimony may appear particularly harmful, it is difficult to assess its direct import on Appellants' reasoning relative to recusal. Accordingly, I limit my rationale to the distinct actions taken by the trial court.

7. Appellee contends that, since the issues presented for review are framed in terms of whether recusal was required "as a matter of law," the Court is precluded from determining whether Judge Rogers abused his discretion in refusing to recuse. Lomas v. Kravitz, 637 Pa. 207, 147 A.3d 517 (2016) (per cu-

Appellants' advocacy closely tracks the reasoning of the Superior Court's Opinion in Support of Reversal ("OISR"), arguing that the appearance of propriety standard is an independently sufficient basis for recusal, *see Goodheart*, 523 Pa. at 201–02, 565 A.2d at 764, and that Pennsylvania courts have required recusal in factually similar situations, *see, e.g., Commonwealth ex rel. Armor v. Armor*, 263 Pa.Super. 353, 398 A.2d 173 (1978). They further contend that proper application of the recusal framework relative to Judge Branca's financial interest mandates the recusal of the entire Montgomery County bench, since the disqualifying circumstances would apply equally to the entire flight of jurists. In Appellants' view, the trial court and OISA improperly limited review to only whether actual bias or prejudice existed.

Appellants also criticize Appellee's proffered "fully informed person" standard— assessing the appearance of impropriety from the perspective of a person who is "*fully informed* of all ... surrounding facts and circumstances" and who closely examines those facts to determine whether the proceedings will be, or were, fairly conducted, or whether the record reveals actual bias or prejudice. Brief for Appellee at 15, 32 (emphasis in original). Appellants contend that adopting such a view would essentially result in a *post hoc* evaluation of whether the process was fair and just, rather than the foundational question underlying the appearance inquiry, which is distinctly aimed at ensuring the public's faith in the judiciary. Further, Appellants observe that Appellee offers no procedures for determining "all of the true facts and surrounding circumstances," and that to do so would likely require a remand for a hearing and discovery, much in line with

the request for documents that Appellants filed, but which was denied. Instead, in Appellants' view, analyzing the appearance of impropriety should simply focus on whether "a significant minority of the lay community could reasonably question the court's impartiality." Reply Brief for Appellants at 10 (quoting *Commonwealth v. Darush*, 501 Pa. 15, 24, 459 A.2d 727, 732 (1983)). Lastly, Appellants dispute that they have conceded that the proceedings were fair and without error, noting that they sought to challenge various aspects of Judge Rogers' damages determination, but that such issues were denied by this Court for review.

In response, Appellee effectively concedes that the appearance of impropriety may independently warrant recusal, but contends that any application should be made by reference to the "fully informed" person. Brief for Appellee at 25 (citing *Pepsico v. McMillen*, 764 F.2d 458, 460 (7th Cir. 1985), *as cited in* 207 Pa. Code § 15–4). In this respect, Appellee argues that, since there is no dispute that Judge Rogers ruled impartially and conducted a fair trial, a person fully informed of these facts could not view Judge Branca's intermittent participation and financial interest as establishing an appearance of impropriety. Stated another way, Appellants' concession that they had a fair trial moots any appearance of impropriety. *See Reilly*, 507 Pa. at 222, 489 A.2d at 1300 ("If the cause is appealed, the record is before the appellate court which can determine whether a fair and impartial trial were had. If so, the alleged disqualifying factors of the trial judge become moot."). Appellee further forwards that this Court has previously found that the lack of actual prejudice or bias during a trial ameliorates any concerns regarding an appearance of im-

*riam*). From my perspective, the substance of this matter pertains to the propriety of recusal

in the circumstances, and I do not read the issues in such a strictly constrained manner.

propriety. *See* Brief for Appellee at 28 n.2 (citing *In re Lokuta*, 608 Pa. 223, 240, 11 A.3d 427, 436–37 (2011)).

Appellee also contends that, except for matters involving public corruption or obvious conflicts of the adjudicating judge, the trial judge has discretion to assess the appearance of impropriety.[8] Because this matter does not fall within the narrow subset of cases that present an appearance of impropriety as a matter of law, *see* 207 Pa. Code § 15–4 (advising as to potential categorical scenarios implicating the appearance of impropriety), it is Appellee's position that Judge Rogers' ruling in this matter should not be overruled.

Moreover, even if Judge Rogers' recusal was appropriate, Appellee proffers that, relative to disqualifying the sum of the Montgomery County bench, the Court should consider the resulting prejudice to him and Appellants' ongoing manipulation of the judicial system. Appellee continues that requiring court-wide recusal in all instances where a litigant was a former client of a sitting judge and provided a referral fee would be unworkable. As a final point, Appellee contends that any reliance on *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009), is misplaced, given the significantly differing factual circumstances.

On the merits, my view substantively aligns with the reasoning developed in the Superior Court's Opinion in Support of Reversal ("OISR"). *See Lomas v. Kravitz*, 130 A.3d 107, 132–45 (Pa. Super. 2015) (OISR). In particular, I agree that the appearance of impropriety standard is an independent substantive precept that may warrant recusal, and that Judge Rogers and the full Montgomery County bench should be recused in this instance predi-

cated on Judge Branca's participation and direct and proportional financial interest in the discretionary damages award despite the presumption that Judge Rogers and the other jurists would handle the matter with impartiality and fairness. Further, I believe the OISR correctly recognized that the case law had, in some instances, mistakenly deemed a trial judge's decision with regard to the appearance of impropriety an "unreviewable decision," when that axiom should only pertain to a judge's self-evaluation for actual bias or prejudice. *See id.* at 138–41 & n.33.

As for Appellee's contentions that are not addressed by the OISR's reasoning, I remain unpersuaded. Regarding the notion that the appearance standard should incorporate the fully informed person framework, I agree that the analysis should be made in light of all the surrounding facts and circumstances, rather than based on incomplete or mistaken information. However, as Appellants cogently observe, Appellee's proffered standard effectively reviews whether the proceedings were fair and just and whether actual bias or prejudice can be found in the record, rather than addressing the gravamen of the appearance of impartiality inquiry, *i.e.*, whether there could be a public perception of impartiality that undermines confidence in the judiciary. *See Reilly*, 507 Pa. at 221, 489 A.2d at 1299 ("[T]he administration of justice should be beyond the appearance of unfairness ... so that courts may as near as possible be above suspicion ...."). In this respect, the *Caperton* Court's observation that a "judge's own inquiry into actual bias ... is not one that the law can easily superintend or review ..." demonstrates the practical difficulty with Appellee's preferred post-judgment analysis. *Caperton*,

---

8. I agree with the largely undisputed notion that appellate courts should review recusal

decisions for an abuse of discretion. *See Reilly*, 507 Pa. at 220, 489 A.2d at 1299.

556 U.S. at 883, 129 S.Ct. at 2263. Further, the *Caperton* decision required an objective test to protect due process principles, which is satisfied by the appearance of impropriety standard. *See id.*

Moreover, although the notion of fairness may facially appear to ameliorate appearance concerns relative to certain objective aspects of the proceedings, the lack of record evidence proving partiality does little to counter the potential public perception that a discretionary ruling, such as the damages calculation in this case, was materially influenced by a judge's relationship with a financially interested entity. Accordingly, I am of the view that the appearance of impropriety—that is, "conduct [that] would create in reasonable minds a perception that the judge violated [the Code of Judicial Conduct] or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge,"·Code of Judicial Conduct Rule 1.2, Comment [5]—alone forms an independent basis for recusal, even in the absence of actual bias, unfairness, or prejudice on the part of the trial judge. *See Lomas*, 130 A.3d at 133 (OISR).[9]

As to Appellee's policy perspective, insisting that court-wide recusals, based on a prior relationship between sitting-judges' and former clients, would prove unworkable, this contention seems predicated on a far broader set of factual circumstances than are at issue in this matter. Here, the Court is concerned only with the implications of a current judge's participation and presently existing financial interest that is directly and proportionally tied to the monetary award determined by a colleague of the same court. Of course, newly elected judges transitioning from private practice will need to be aware of the challenges that such a shift presents, but I do not believe that the position expressed here would impose the significantly disruptive burdens that Appellee predicts.

Lastly, although I agree with Appellee that *Caperton* is distinguishable on its facts, the import of that case, at least relative to Appellee's claims, is its due process based mandate for objective appellate review of the appearance of impropriety, thus reinforcing the notion that appearances—apart from actual bias, prejudice, and unfairness—are a necessary component of the recusal framework.

Ultimately, I am of the view that Judge Branca's participation in this matter and his present primary financial interest in the monetary damages, assessed by a colleague who shares the same bench, establishes an appearance of impropriety that warrants the recusal of the entirety of the Court of Common Pleas of Montgomery County. Further, I believe that this conclusion requires a new trial as to both liability and damages before a judge assigned from outside of Montgomery County. Although the relevant facts apparently were not revealed to Judge Rogers and Appellants until the damages phase, the appearance of impropriety created by Judge Branca's participation and financial interest clouds both phases of the trial, which could have been avoided had a full disclosure been proffered when the matter initially arose

---

9. The OISR notes that some authorities employ the above language from the Code of Judicial Conduct, while others follow Appellants' preferred formulation, pertaining to a significant minority of the lay community. *See Lomas*, 130 A.3d at 140 n.31 (OISR). From my perspective, this is largely a distinction without a difference, although it appears to me that the former has been referenced with greater frequency than the later. *See, e.g.,* 207 Pa. Code. § 15–4 (formal advisory opinion regarding disqualification and recusal).

pretrial. *See supra* note 5.[10]

**10.** Although the above reasoning would dispose of this matter, there are additional potential procedural irregularities that emerged in this case relative to Judge Rogers' initial order for recusal of the full Montgomery County bench, which I believe reinforces the uncertainty that seems to envelope this area of law in Pennsylvania jurisprudence.

For example, in some jurisdictions, recusal orders may not be reconsidered by the issuing judge, even if filed "prematurely," *Lomas v. Kravitz*, No. 00–05929, at 8, 2008 WL 10689212 (C.P. Montgomery Cnty. filed Dec. 31, 2008), or otherwise erroneously submitted. *See Moody v. Simmons*, 858 F.2d 137, 143 (3d Cir. 1988) ("Once a judge has disqualified himself, he or she may enter no further orders in the case[, with power thus] limited to performing ministerial duties necessary to transfer the case to another judge (including the entering of 'housekeeping' orders)." (citations omitted)). *But see United States v. Lauersen*, 348 F.3d 329, 338 (2d Cir. 2003) (concluding that a judge may revisit a recusal order, citing changed circumstances as an example of circumstances justifying such).

Additionally, the prevailing view among jurisdictions is that once the recusal order is signed, the submitting judge is barred from reentering the case, except for narrow circumstances in which the disqualifying factor is removed, or there was a material error as to the existence of the recusal-inducing fact. *See Luce v. Cushing,* 177 Vt. 600, 868 A.2d 672, 677–78 (2004) (collecting cases). However, there is a minority view that takes a more strict approach, prohibiting a recused judge from rendering any further decisions in the case, regardless of circumstances. *See Jenkins v. Motorola, Inc.*, 911 So.2d 196, 197 (Fla. Dist. Ct. App. 2005) (citation omitted); *Tatum v. Orleans Par. Sch. Bd.*, 894 So.2d 1180, 1181 (La. Ct. App. 2005) (citation omitted).

Although, in the proper case, the above considerations may be dispositive, the parties' present advocacy has not been developed along these lines.